**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JORDAN DESIR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>NELSON UNIVERSITY, a Texas nonprofit corporation,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Jordan Desir ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Nelson University ("Nelson" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against Nelson University for its failure to secure and safeguard the personally identifiable information ("PII" or "Private Information") of Plaintiff and Class Members.

2. Defendant Nelson University, a Texas nonprofit corporation, operates a private Christian university located in Waxahachie, Texas, offering associate, bachelor's, master's, and doctoral degree programs to students on campus and online.[1] In the regular course of its business, Nelson University collects, stores, and maintains the PII of individuals and is required to maintain

[1] Our History, Nelson University, https://www.nelson.edu/about/ (last visited June 23, 2026).

reasonable and adequate security measures to protect such information from unauthorized access and disclosure.

3. On or about April 6, 2025, Nelson University learned that an unauthorized third party had gained access to its network and, between on or about March 21, 2025, and on or about April 6, 2025, accessed and obtained files containing the PII of its students and other individuals (the "Data Breach").

4. Nelson University owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their PII from unauthorized access and disclosure. Nelson University breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect students' and other individuals' PII from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments to implement adequate security measures to protect their constituents' data.

5. Nelson University required its students and other individuals to provide sensitive PII and failed to protect that information. Nelson University had an obligation to secure students' and other individuals' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Nelson University and Plaintiff and Class Members.

6. As a result of Nelson University's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and public

reporting that a ransomware group claimed to have posted data taken from Nelson University on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII, which PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7. Plaintiff and Class Members have incurred, and will continue to incur, reasonable costs and expend time to monitor and mitigate the risk of identity theft and fraud caused by the Data Breach.

8. Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Nelson University to ensure that it implements and maintains reasonable data security practices going forward.

**THE PARTIES**

9. Plaintiff Jordan Desir is a citizen of the State of Georgia whose Private Information was compromised as a result of the Data Breach.

10. Defendant Nelson University is a nonprofit corporation organized under the laws of the State of Texas with its principal place of business in Waxahachie, Texas.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value

of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

12. For purposes of the Class Action Fairness Act, Defendant Nelson University is deemed to be a citizen of both the state in which it has its principal place of business and the state under whose laws it is incorporated, pursuant to 28 U.S.C. § 1332(c)(1). Nelson University is incorporated under the laws of Texas and maintains its principal place of business in Waxahachie, Texas.

13. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and conducts business in this District.

14. Venue is proper in this District and in the Dallas Division pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business in Waxahachie, Ellis County, Texas, and a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

## GENERAL ALLEGATIONS

15. This is a class action brought by Plaintiff, individually and on behalf of all persons similarly situated (i.e., the Class Members), seeking to redress Nelson University's failure to reasonably safeguard Plaintiff's and Class Members' Private Information. Plaintiff and the other Class Members are individuals whose Private Information was collected, maintained, and stored by Nelson University in connection with their enrollment, application, employment, or other relationship with the university.

16. Between on or about March 21, 2025, and on or about April 6, 2025, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII.

17. This action pertains to Nelson University's unauthorized disclosures of Plaintiff's PII that occurred during the Data Breach.

18. Nelson University disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of Nelson University's failure to safeguard and protect their PII.

19. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Nelson University assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

20. Despite recognizing its duty to do so, Nelson University failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

21. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Nelson University to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

**A. The Data Breach**

22. According to a data breach notification ("Breach Notice") sent to Plaintiff and Class Members, an unauthorized actor gained access to Nelson University's network systems from on or about March 21, 2025, to on or about April 6, 2025. During this period, the unauthorized actor accessed and obtained files containing the PII, including names, Social Security numbers or individual taxpayer identification numbers, driver's license numbers or other government-issued identification numbers, financial information, and medical information.

23. Upon detecting the unauthorized activity, Defendant initiated an investigation and concluded, on or about May 26, 2026, that certain files containing the Private Information of Plaintiff and Class Members had been accessed and obtained by an unauthorized actor. However, Defendant did not begin notifying affected individuals until on or about June 15, 2026, that their Private Information may have been compromised as a result of the Data Breach. During that entire

period, Plaintiff and Class Members were unaware that their Private Information had been compromised and were unable to take any protective measures.

24. The Breach Notice posted on Nelson University's website did not specify detailed measures or actions taken by Nelson University to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

25. Upon information and belief, the Data Breach was perpetrated by the ransomware group known as Qilin, which claimed responsibility for the attack and, on or about April 16, 2025, posted on the dark web claiming to have obtained data taken from Nelson University's systems. Public reporting concerning that posting supports the inference that data was exfiltrated from Nelson University's systems and exposed to unauthorized third parties, thereby increasing the risk of misuse of Plaintiff's and Class Members' Private Information.

**B. Defendant's Data Security Obligations and the Applicable Standard of Care.**

26. As an institution of higher education that participates in federal student financial aid programs under Title IV of the Higher Education Act, Defendant is a "financial institution" subject to the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801–6809, and the Federal Trade Commission's Standards for Safeguarding Customer Information (the "Safeguards Rule"), 16 C.F.R. Part 314. The Safeguards Rule requires Defendant to develop, implement, and maintain a comprehensive information security program with administrative, technical, and physical safeguards appropriate to the sensitivity of the customer information it handles. Although these authorities do not themselves create a private cause of action, they establish the duty-of-care framework that informs the reasonable-security obligations applicable to Defendant.

27. The Safeguards Rule requires Defendant, among other things, to: (a) designate a qualified individual responsible for overseeing and implementing its information security program, 16 C.F.R. § 314.4(a); (b) base its information security program on a written risk

assessment that identifies reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, *id.* § 314.4(b); (c) design and implement safeguards to control the identified risks, including access controls, encryption of customer information at rest and in transit, and multi-factor authentication, *id.* § 314.4(c); and (d) regularly test and monitor the effectiveness of those safeguards, *id.* § 314.4(d). In addition, the Texas Identity Theft Enforcement and Protection Act requires any business that maintains sensitive personal information to implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect that information from unlawful use or disclosure. Tex. Bus. & Com. Code § 521.052(a).

28. In addition to the duty-of-care framework provided by the Gramm-Leach-Bliley Act and the FTC Safeguards Rule, Defendant's data-security obligations are informed by widely recognized federal and industry guidance. The Federal Trade Commission has long advised businesses that reasonable data security includes building security into operations from the outset, employing access controls and strong authentication, conducting network monitoring and segmentation, providing secure remote access, applying timely patches, and implementing secure development practices.[2] The FTC has further explained that reasonable security includes inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning ahead for breaches.[3]

29. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[4]

---

[2] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

[3] *See* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[4] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-inform

Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

30. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords on networks; use industry-tested security measures; monitor for suspicious activity on networks; and verify that third-party service providers have implemented reasonable security measures.[6]

31. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

32. The National Institute of Standards and Technology ("NIST") has published a comprehensive catalog of security and privacy controls that establishes objective benchmarks for reasonable security, including controls for access management, incident response, risk assessment,

ation.pdf.

[5] *Id.*

[6] *Id.*

audit logging, authentication, and vendor management.[7] NIST has further published current best-practice guidance on incident response that aligns with the NIST Cybersecurity Framework 2.0.[8]

33. The Center for Internet Security has published the CIS Critical Security Controls, a prioritized and actionable set of safeguards that maps to NIST and other authoritative frameworks and represents the consensus industry best practice for reasonable security.[9]

34. The U.S. Department of Education, through Federal Student Aid, has long required postsecondary institutions that participate in Title IV programs to comply with GLBA information-security requirements and the FTC Safeguards Rule. Federal Student Aid has explained that postsecondary institutions and third-party servicers must protect student financial-aid information provided by the Department or otherwise obtained in support of the administration of Title IV programs, and that each participating institution agrees in its Program Participation Agreement to comply with the GLBA Safeguards Rule under 16 C.F.R. Part 314.[10]

35. The FTC has likewise explained that the Safeguards Rule requires covered financial institutions to develop, implement, and maintain a written information-security program with administrative, technical, and physical safeguards designed to protect customer information, including safeguards appropriate to the size and complexity of the institution, the nature and scope

[7] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.
[8] *See* Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.
[9] *See* Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.
[10] U.S. Dep't of Educ., Fed. Student Aid, *Updates to the Gramm-Leach-Bliley Act Cybersecurity Requirements* (Feb. 9, 2023), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2023-02-09/updates-gramm-leach-bliley-act-cybersecurity-requirements.

of its activities, and the sensitivity of the information at issue.[11]

36. The Cybersecurity and Infrastructure Security Agency ("CISA"), in conjunction with the Multi-State Information Sharing and Analysis Center, has published the #StopRansomware Guide, which prescribes basic, well-established measures that organizations—including educational institutions—are expected to implement to mitigate the threat of ransomware and similar intrusions, including phishing-resistant multi-factor authentication, prompt installation of operating-system and software updates, and ongoing user training.[12]

37. By collecting, using, and storing Plaintiff's and Class Members' Private Information for its commercial benefit, Defendant assumed a duty to implement and maintain reasonable security measures consistent with applicable federal and industry standards. Defendant's duty included, but was not limited to, encrypting Private Information at rest and in transit, implementing multi-factor authentication, deploying logging and monitoring systems sufficient to detect intrusions, maintaining current operating systems and software patches, training its workforce on data security and phishing risks, and implementing reasonable policies and procedures to detect, respond to, and contain security incidents.

**C. The Data Breach was Preventable**

38. The Data Breach was eminently foreseeable. The education sector, and colleges and universities in particular, has long been a leading target of cyberattacks and ransomware, and Defendant knew, or, in the exercise of reasonable care, should have known, that its network and the Private Information stored on it were likely targets of cybercriminals.

---

[11] Fed. Trade Comm'n, *FTC Safeguards Rule: What Your Business Needs to Know*, https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know.

[12] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025).

39. Federal regulators have repeatedly warned organizations that hold sensitive personal information, including institutions of higher education, about the foreseeable risk of cyberattacks. Federal cybersecurity guidance has been promulgated specifically because cyberattacks against organizations holding Social Security numbers and similar data were known to be common, foreseeable, and devastating to the affected individuals.[13] CISA has likewise issued ongoing public guidance regarding ransomware and similar intrusions targeting organizations across sectors, including educational institutions.[14]

40. Numerous publicly reported cyberattacks against colleges, universities, and other educational institutions in the years preceding the Data Breach put Defendant on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted. Educational institutions have repeatedly been the subject of high-profile cyberattacks resulting in the compromise of student and employee PII in volumes ranging from tens of thousands to millions of records. The education sector's sustained position as one of the most-targeted sectors for cyberattacks is well documented.[15]

41. Had Nelson University maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded student and individual data. Nelson University's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

42. Nelson University was at all times fully aware of its obligation to protect students'

---

[13] *See* supra notes 10-11.
[14] *See* supra note 19.
[15] *See* Identity Theft Resource Ctr., 2025 Annual Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (the education sector has experienced repeated cybersecurity incidents involving student, applicant, employee, and alumni data, making the risk of unauthorized access to university systems foreseeable).

and other individuals' PII and the risks associated with failing to do so. Nelson University knew that information of the type collected, maintained, and stored by Nelson University is highly coveted and a frequent target of hackers.

43. This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:




44. By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[16]

45. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

46. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious

[16] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 23, 2026).

actors buy and sell that information for profit.[17]

47. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[18]

48. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[19]

49. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of

---

[17] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

[18] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year.

[19] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

today's businesses only broadens the number of potential sources for hackers to target."[20]

50. The PII of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[21] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

51. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[24]

---

[20] *Stolen PII/PHI & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-PII/PHIramifications-identity-theft-fraud-dark-web/.

[21] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[22] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[23] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

[24] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

52. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

53. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

54. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

55. The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[26]

56. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional

---

[25] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[26] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

57. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

58. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

59. Data breaches facilitate identity theft, as hackers obtain consumers' PII and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' PII to others who do the same.

60. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[27] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[28]

61. The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals

---

[27] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[28] *Id.*

to profit off this highly sensitive information.

**D. The Impact of Data Breach on Victims**

62. Nelson University's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, namely Social Security numbers or individual taxpayer identification numbers together with first and last names, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

63. The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

64. Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

65. Given Nelson University's notice that files containing Plaintiff's and Class Members' Private Information were accessed and obtained, and public reporting that a ransomware group claimed to have posted data taken from Nelson University, many victims of the Data Breach have likely already suffered significant harms, including, but not limited to, identity theft and

fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

66. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[29]

67. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

[29] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[30]

68. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

69. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[31]

70. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

71. As a result of the wide variety of injuries that can be traced to the Data Breach,

---

[30] *Id.*

[31] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII permitted by Nelson University without their permission;

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

72. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing

up the issues" relating to identity theft or fraud.[32]

73. Plaintiff and Class Members place significant value in data security. According to a survey conducted by the cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider with better data security. Seventy percent of consumers would provide less personal information to organizations have suffered a data breach.[33]

74. Plaintiff and Class Members have a direct interest in Nelson University's promises and duties to protect PII, i.e., that Nelson University would *not increase* their risk of identity theft and fraud. Because Nelson University failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Nelson University's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for Nelson University's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

75. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through Nelson University's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—

---

[32] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[33] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

76. Plaintiff and Class Members have an interest in ensuring that their PII is secure and not subject to further theft, as Nelson University continues to hold it.

**E. Defendant Failed to Implement Reasonable Security Measures.**

77. Notwithstanding the foreseeable risk of a cyberattack and the well-established standards of care set forth above, Defendant failed to implement reasonable security measures sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized access.

78. The Data Breach itself is evidence that Defendant's data-security practices fell below the applicable standard of care. Upon information and belief, had Defendant implemented reasonable, industry-standard measures, including appropriate encryption, multi-factor authentication, network segmentation, logging and monitoring, timely patching, backup controls, and workforce training, the risk of unauthorized access to and acquisition of Plaintiff's and Class Members' Private Information would have been materially reduced, and the unauthorized activity likely would have been detected, contained, or mitigated earlier.

79. Defendant's failure to detect the unauthorized access for some period of time and its lengthy delay in completing its investigation and notifying affected individuals further reflect deficient incident-response capabilities inconsistent with the standard of care set forth in NIST SP 800-61 Rev. 3 and the FTC's *Data Breach Response: A Guide for Business* (Aug. 2023).[34]

**F. Plaintiff's Experience**

80. Plaintiff is a citizen of the State of Georgia and a former student of Defendant. As a condition of his enrollment and relationship with Defendant, Plaintiff entrusted Defendant with his Private Information.

81. In connection with his enrollment at and relationship with Nelson University, Plaintiff was required to provide Nelson University with his Private Information, including his name and Social Security number or individual taxpayer identification number. Plaintiff did so with the reasonable expectation that Nelson University would safeguard that information.

82. On or about June 15, 2026, Plaintiff received a notification letter from Nelson University informing him that his Private Information was compromised in the Data Breach.

83. As a direct and proximate result of the Data Breach, Plaintiff has experienced a marked increase in unsolicited telephone calls, including suspected scam and phishing calls.

84. After the Data Breach, Plaintiff experienced fraudulent charges totaling approximately $500 on his credit card, which he discovered between approximately May and June 2026, and was required to obtain a replacement credit card and change his account access credentials as a result.

85. As a direct and proximate result of the Data Breach, Plaintiff has incurred out-of-pocket costs for independent credit monitoring services to protect against the misuse of his Private

[34] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

Information.

86. Plaintiff has spent, and will continue to spend, time and effort responding to the Data Breach, including by changing email account access credentials, monitoring incoming communications for indicia of identity theft, and considering and evaluating additional protective measures, such as credit monitoring and placing fraud alerts or credit freezes.

87. Plaintiff has suffered, and will continue to suffer, anxiety, concern, and emotional distress arising from the loss of control over his Personal Information and from the imminent and ongoing risk that his Personal Information will be used to commit identity theft or fraud against him.

88. Plaintiff did not consent to Nelson University's release of his Personal Information to unauthorized third parties, and he would not have provided his Personal Information to Nelson University—or would have provided less of it—had he known of Nelson University's deficient cybersecurity practices.

**G. Injuries Suffered by Plaintiff and the Class.**

89. As a direct and proximate result of the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, injury and damages, including, but not limited to:

a) the unauthorized acquisition and disclosure of their Personal Information by criminal third parties, and the corresponding loss of privacy and confidentiality in that information;

b) a substantial and certainly impending increased risk of identity theft, financial fraud, medical identity theft, and other forms of misuse of their Personal Information—risks that justify and require ongoing expenditures for protective and remedial services;

c) lost time, lost productivity, and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach, including the costs and effort associated with monitoring credit and financial accounts, placing and lifting fraud alerts and credit freezes, and obtaining identity theft and credit monitoring services;

d) the diminished value of their Personal Information, for which there is a well-

documented economic market;

e) anxiety, concern, and emotional distress arising from the loss of control over their Personal Information and the ongoing risk of misuse of that information;

f) a marked increase in unsolicited telephone calls, electronic messages, and other communications consistent with the misuse of their Personal Information;

g) the deprivation of the benefit of the bargain in their relationship with Defendant, in that they paid Defendant tuition, fees, and other consideration, a portion of which was understood to be allocated to the protection of their Personal Information, a service Defendant failed adequately to provide; and

h) the continuing risk to their Personal Information, which remains in Defendant's possession and continues to be subject to further unauthorized access in the absence of adequate remediation.

## CLASS ACTION ALLEGATIONS

90. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed class (collectively, "the Class"), defined as follows:

> **Nationwide Class**
> All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

91. Excluded from the proposed Class are any officer or director of Nelson University; any officer or director of any affiliate, parent, or subsidiary of Nelson University; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

92. **Numerosity:** Members of the proposed Class number more than 35,000 individuals, including approximately 22,000 residents of Texas, and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Nelson University's own records.

93. **Commonality and Predominance:** Common questions of law and fact exist as to

the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Nelson University engaged in the wrongful conduct alleged herein;

b. Whether Nelson University's inadequate data security measures were a cause of the Data Breach;

c. Whether Nelson University owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether Nelson University negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether Nelson University failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

94. Nelson University engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in both quantity and quality by comparison to the numerous questions that dominate this action.

95. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Nelson University's misconduct affected all Class Members in the same manner.

96. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class

because his interests do not conflict with the interests of the other Class Members he seeks to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

97. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Nelson University, making it impracticable for Class Members to individually seek redress for Nelson University's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create the potential for inconsistent or contradictory judgments, increasing delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Class Against Defendant)*

98. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

99. Plaintiff brings this claim individually and on behalf of the Class.

100. To enroll in, apply to, attend, receive services from, or otherwise maintain a

relationship with Nelson University, Plaintiff and Class Members were required to provide non-public personal information to Nelson University. Plaintiff and Class Members are current or former students, applicants, employees, or other individuals who entrusted their sensitive PII to Nelson University in connection with that relationship. That information was collected, stored, and maintained by Nelson University as part of its operations, and Plaintiff and Class Members reasonably expected Nelson University to safeguard their information consistent with its legal and contractual obligations.

101. By collecting, storing, sharing, and using individuals' data on the Defendant's computer network for commercial gain, Nelson University owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected.

102. Defendant owed a duty of care to Plaintiff and Class Members to maintain data security according to industry standards and other relevant requirements. Defendant was also responsible for ensuring their systems, networks, and personnel adequately protected the Private Information.

103. Defendant's duty of care to use reasonable security measures arose from the relationship between Nelson University and Plaintiff and Class Members, who entrusted their sensitive PII to Nelson University in connection with their enrollment, application, employment, or other relationship with the university. This duty is recognized by applicable laws and regulations, including, but not limited to, the Gramm-Leach-Bliley Act and the FTC Safeguards

Rule, 16 C.F.R. Part 314, and the Texas Identity Theft Enforcement and Protection Act, Tex. Bus. & Com. Code § 521.052, as well as common-law principles requiring reasonable care in safeguarding confidential information. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

104. Defendant's duty included implementing and maintaining reasonable security measures under the Gramm-Leach-Bliley Act and the FTC Safeguards Rule to safeguard sensitive personal information from both intentional and unintentional use or disclosure. This included establishing appropriate administrative, technical, and physical safeguards to protect Plaintiff's and Class Members' PII, including the development and maintenance of a comprehensive written information-security program, the encryption of sensitive information, the implementation of access controls and multi-factor authentication, and the regular testing and monitoring of the effectiveness of those safeguards. 16 C.F.R. § 314.4.

105. In addition, Defendant had a duty to employ reasonable security measures under the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801–6809, and its implementing Safeguards Rule, 16 C.F.R. Part 314, which require financial institutions, including institutions of higher education that participate in Title IV student-aid programs, to develop, implement, and maintain a comprehensive information-security program to protect the security and confidentiality of customer information.

106. Nelson University breached its duties by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII.

107. It was reasonably foreseeable that Nelson University's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII would

result in an unauthorized third-party gaining access to such information for no lawful purpose.

108. As a direct result of Nelson University's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' confidential information, Plaintiff and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, emotional distress, lost time, mitigation costs, out-of-pocket expenses, and increased risk of identity theft and fraud.

109. Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

110. Nelson University's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

111. As a result of Nelson University's above-described wrongful actions, inaction that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) the diminished value of data-security protections promised for Plaintiff' information.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Class)*

112. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

113. When Plaintiff and Class Members provided their Private Information in connection with their enrollment, application, employment, or other relationship with Nelson University, and Nelson University thereafter collected, stored, and maintained that information as part of its operations, Plaintiff and Class Members entered into implied contracts with Nelson University under which Nelson University agreed to reasonably safeguard and protect their Private Information.

114. Nelson University solicited, received, accessed, stored, and processed Plaintiff's and Class Members' Private Information as part of its regular operations, including educational, enrollment, and administrative services. Plaintiff and Class Members provided their Private Information to Nelson University with the reasonable expectation that it would be safeguarded and protected from unauthorized access.

115. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Nelson University's data security practices complied with relevant laws and regulations, including the Gramm-Leach-Bliley Act and the FTC Safeguards Rule, and adhered to industry standards applicable to the protection of sensitive personal information such as Social Security numbers.

116. Plaintiff and Class Members paid money for tuition, fees, and related educational services, with the reasonable belief and expectation that a portion of those payments would be used to implement and maintain adequate data security measures. Nelson University failed to maintain reasonable and adequate data security.

117. Plaintiff and Class Members would not have entrusted their Private Information to Nelson University in connection with their relationship with the university in the absence of the implied contracts under which Nelson University agreed to keep such information reasonably secure.

118. Plaintiff and Class Members would not have provided their Private Information to Nelson University, or permitted that information to be collected and maintained by Nelson University, absent Nelson University's implied promises to monitor its computer systems and networks and to adopt reasonable data security measures to protect that information from unauthorized access.

119. Nelson University breached its implied contract with Plaintiff and Class Members by failing to safeguard and protect their Private Information.

120. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

121. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

122. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia: (i) strengthen its data security systems and monitoring procedures; (ii) implement reasonable administrative, technical, and physical safeguards consistent with applicable law and industry standards; and (iii) provide adequate credit monitoring and identity-protection services to affected Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Nationwide Class)*

123. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

124. Plaintiff and Class Members conferred a benefit upon Nelson University in the form of their Private Information, which Nelson University collected, stored, and used in connection with educational and administrative services, with the implicit understanding that Nelson University would adequately safeguard the PII entrusted to it. Additionally, Nelson University received payment for tuition, fees, and related educational services provided to Plaintiff and Class Members.

125. Nelson University accepted and had knowledge of the benefits conferred upon it by Plaintiff and Class Members, including access to, use of, and reliance upon their PII in the ordinary course of its operations. Nelson University further benefited financially from providing educational and related services to Plaintiff and Class Members while retaining and utilizing their sensitive information.

126. As a result of Nelson University's conduct, Plaintiff and Class Members suffered actual damages.

127. In the alternative to Plaintiff's contract claim, Nelson University should not be permitted to retain the benefits conferred by Plaintiff and Class Members, including tuition, fees, and other payments made by student Class Members, and the value Nelson University derived from collecting, storing, and using Class Members' Private Information, while failing to provide reasonable data-security protections.

128. Nelson University should be compelled to provide, for the benefit of Plaintiff and Class Members, all unlawful proceeds received by it as a result of the conduct and Data Breach

alleged herein.

**COUNT IV**
**DECLARATORY JUDGMENT (28 U.S.C. §§ 2201, 2202)**
*(On Behalf of Plaintiff and the Class)*

129. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

130. An actual controversy has arisen between Plaintiff and Class Members on the one hand, and Defendant on the other, concerning Defendant's data security obligations to safeguard the Private Information of Plaintiff and Class Members and the adequacy of Defendant's ongoing data security practices.

131. Plaintiff and Class Members continue to be at substantial and continuing risk of injury arising from the permanent compromise of their Social Security numbers and other Private Information, and they remain dependent on Defendant's ongoing data security practices to prevent further unauthorized access to or disclosure of their Private Information that may remain in Defendant's possession or in the possession of Defendant's affiliates, program partners, and service providers.

132. Defendant's ongoing data security practices have not been demonstrated to be reasonable, and Defendant continues to maintain Private Information regarding Plaintiff and Class Members in environments substantially similar to those that were compromised in the Data Breach.

133. Plaintiff and Class Members seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) Defendant's existing data security practices are not reasonable and do not comply with applicable legal and industry standards, including the Gramm-Leach-Bliley Act and the FTC Safeguards Rule; (b) Defendant owes a continuing duty of care to safeguard the Private Information of Plaintiff and Class Members; and (c) Defendant must implement and maintain

reasonable administrative, technical, and physical safeguards, consistent with the Gramm-Leach-Bliley Act, the FTC Safeguards Rule, and current industry standards, to protect the Private Information of Plaintiff and Class Members on an ongoing basis.

134. Plaintiff and Class Members also seek such further necessary or proper relief based on the declaratory judgment as the Court may grant pursuant to 28 U.S.C. § 2202.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Nelson University, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, nominal damages, punitive damages where available, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Nelson University from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: June 24, 2026

Respectfully submitted,

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery
Texas Bar No. 24052214
lmontgomery@eksm.com
service@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
5621 Arch Bridge Ct.
Arlington, Texas 76017
Phone: (888) 350-3931
Fax: (888) 276-3455

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

*Attorneys for Plaintiff and the Proposed Class*

*Pro Hac Vice Application Forthcoming